UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHARLES CATLIN,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | § | C.A. NO. C-04-047 |
| | § | |
| ST. PAUL FIRE & MARINE INS. CO.,<br>    Defendants. | §<br>§<br>§ | |

## MEMORANDUM OPINION AND ORDER ENTERING JUDGMENT IN FAVOR OF THE DEFENDANT

Plaintiff Charles Catlin sued defendant St. Paul Fire and Marine Insurance Company.  Trial was for failure to pay insurance benefits for the loss of the LAURA T, a sail boat.  This Court finds in favor of the defendant.

### I.  JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

### II.  FACTS

**A.  Summary of Events**

On April 26, 2003, plaintiff Charles Catlin set sail from Port Aransas, Texas on a 1985 37' Fortuna by the name of LAURA T.  While under sail in the Gulf of Mexico, Catlin, the owner and only crew member, fell asleep above deck when he lay down for a nap.  While sleeping for an estimated hour to three and a half hours, the boat was on auto-pilot, the high water alarm was on mute, and no one was on watch.  When Catlin

1

awoke, he was startled to find that the vessel had taken on water. The bilge pumps failed, and the vessel sank in the Gulf of Mexico and was a total loss.

**B. Testimony at Trial**

1. The Physical Condition of the Vessel

  Mr. Catlin purchased the LAURA T in 1999, and had it transported to Lake Texoma. He testified that since the time he purchased the vessel, he performed many of the repairs and routine maintenance. He holds no professional certificates, but had prior experience working as a service manager in the marina at Lake Texoma. There, he inspected clients vessels and oversaw the repair, rigging, and fitting of sail boats. Before transporting the vessel from Lake Texoma to Corpus Christi in spring of 2002, Mr. Catlin performed a "bottom job," meaning he scraped off anti-filing paint, repainted the hull, and replaced the shaft-packing. Before placing the vessel in the water in Corpus Christi, Catlin reinspected it, checked for damage, inspected all through holes and fittings, and also adjusted the packing. On June 14, 2002, Mr. Catlin requested a survey for insurance purposes, which Andy Finken (an expert witness in this trial) executed. Mr. Finken gave a few minor repair recommendations, but the insurance policy was approved. In October 2002 there was a fire on the LAURA T, for which St. Paul provided coverage for the damage. Catlin performed most of the necessary repairs himself. St. Paul inspected the vessel after the fire, and determined the boat was still sound.

When Catlin first purchased the LAURA T in 1999, he installed both of the vessel's bilge pumps. Mr. Catlin testified that he performed a routine inspection each time he sailed, including lifting up the engine access panel to examine the bilge pumps. He also testified that he did not replace the bilge pumps as a preventative maintenance item. Rather, he testified that bilge pumps either "work or they don't," and he typically used bilge pumps until they stopped working. Mr. Catlin had not replaced the bilge pumps on the LAURA T since installing them when he first purchased the boat.

2. Mr. Catlin's Sailing Experience

Mr. Catlin had prior experience sailing in the United States Coast Guard and spent a month in sailing school sponsored by the United States Navy during this time. He testified that sailing has been a hobby of his for a long time and that he has owned a large sailing craft continuously since 1996. Prior to April 26, 2003, he regularly sailed the LAURA T in the Corpus Christi bay. Before purchasing the Fortuna 37', he owned a C&C 29', which he had previously sailed off shore approximately four times. On one occasion he sailed the C&C 29' from Corpus Christi, Texas to Veracruz, Mexico with only his girlfriend and son, neither of whom had any sailing experience. The voyage in the LAURA T on April 26, 2003, however, was his first solo off shore trip.

3. The Events of April 26, 2003

Mr. Catlin set sail the morning of April 26, 2003 from the marina in Port Aransas, Texas. He testified that he inspected the vessel before taking off, and that no leaks were

apparent. He headed south for four hours, before eating lunch. At this point, the vessel was on auto-pilot, headed closer toward shore and there was no indication that water was leaking. After lunch, Mr. Catlin testified that he laid down on the dinghy, watched the waves, and dozed off. Catlin estimated that he slept anywhere from an hour to three and a half hours. When he awoke, three feet of water had entered the vessel. The high water alarm was on mute and the bilge pumps failed. Catlin abandoned ship when the water was up to his armpits. He was ultimately rescued by the Coast Guard.

4.  Expert Testimony

When asked whether it was prudent to sleep with the auto-pilot on during an individual's first solo off shore voyage, plaintiff's witness Judge Robert Blackmon testified, "No. That doesn't sound like a very prudent thing to do." Blackmon also testified that many sailors manage sailing alone by "cat-napping," or sleeping only twenty minutes at a time. Plaintiff's expert witness Richard Frenzel testified, "It is always unwise [to nap while sailing singlehandedly], but it's done all the time." Plaintiff's expert Andy Finken testified that whether napping is prudent depends on the circumstances, including how long the individual has been off shore.

Defendant's expert witness David Linzy testified he would want to have the highwater alarm on if he were alone off shore and there was a possibility of napping. Mr. Linzy also testified that the vessel was not seaworthy, and explained the LAURA T's unseaworthiness as a "chain of events." The fact that the vessel was taken off shore 20

miles by one person, that this was his first solo voyage, that the bilge pumps failed, that the high water alarm was turned off, that he fell asleep, that the boat was on auto-pilot, and that there was no one on watch all contributed to the boats unseaworthiness. Additionally, he testified that sleeping during the incident without a look out rendered Mr. Catlin an incompetent crew.

### III.  DISCUSSION

**A.  The Insurance Policy and Burden of Proof**

The relevant clause in the St. Paul Fire & Marine Insurance policy is: "All coverage under this policy will be void if you do not maintain your boat in seaworthy condition at all times." (Exh. 9 at 7). The insured has the burden of proof to demonstrate that the loss sustained was fortuitous and that a condition of the policy has been satisfied. *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 429-30 (5th Cir. 1980). The American rule regarding the shipowner's warranty of seaworthiness is that "the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition." *Saskatchewan Government Ins. Office v. Spot Pak*, 242 F.2d 385, 388 (5th Cir. 1957).  In an insurance dispute involving seaworthiness, when there is no showing that shipowner, or any one in privity with shipowner, was aware of the unseaworthy condition, there is no breach of the limited warranty of seaworthiness. *Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co.*, 247 F.2d 116, 120-21 (5thCir. 1957).    The insured generally has the burden of proof

5

to show that the loss arose from a covered peril. *Morrison Grain Co. v. Utica Mutual Ins. Co.*, 632 F.2d 424, 429-30 (5th Cir. 1980). "When a vessel sinks in calm waters, a presumption arises that the vessel was unseaworthy in some particular." *P.T. TUGS, Inc. v. United States Fire Ins. Co.*, 796 F.2d 125, 127 (5th Cir. 1986) (quoting *Boston Insurance Co. v. Dehydrating Process Co.*, 204 F.2d 441 (1st Cir. 1953)). This is a rebuttable presumption and the insured can prove that the vessel was seaworthy before the sinking. Once this particular presumption is rebutted, there arises a counter presumption that the loss was caused by a "fortuitous suit of the sea." *Id.* On the day the LAURA T sank in the Gulf of Mexico, there were no weather advisories, and the sea was calm. Because the vessel sank in calm waters, the burden shifts to Mr. Catlin to rebut the presumption of unseaworthiness and to prove that the vessel was seaworthy at the time of the sinking.

## B.  Seaworthiness

The meaning of seaworthiness varies with the circumstances. *Marshall v. Ove Redari A/S*, 378 F.2d 193, 196 (5th Cir. 1979). A vessel can be rendered unseaworthy, not only because of its physical condition, but also because of the behavior of the crew. *Id.* (citing *Boudoin v. Lykes Bros. S.S. Co.*, 75 S. Ct. 382, 385 (1955)). Unseaworthiness can be established if the crew is insufficient in number or incompetent in ability. *Orient Mid-East Lines, Inc. v. A Shipment of Rice, etc.*, 496 F.2d 1032, 1040 (5th Cir. 1974). Mere negligence of the crew, however, will not excuse an insurance

company from covering the loss. *Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co.*, 247 F.2d 116, 119 (5th Cir. 1957).

## C.  Incompetence vs. Negligence

Incompetence while manning a vessel is sufficient to render the vessel unseaworthy, while mere negligence is not. *Lemar Towing, Co., Inc. v. Fireman's Fund Insurance Co.*, 352 F. Supp. 652, 660 (E.D. La. 1972); *see also Acadia Ins. Co. v. Allied Marine Transport LLC*, 151 F. Supp. 2d 107, 120 (D. Me. 2001).  A crew is deemed merely negligent if it fails to use simple means at hand to make the vessel seaworthy. *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 389 (5th Cir. 1957).  Negligence and unseaworthiness are not mutually exclusive concepts.  "[A] finding of navigational negligence on a single occasion does not preclude an additional finding of unseaworthiness due to the crew's incompetence."  *Potomac Transport, Inc., v. Ogden Marine, Inc.*, 909 F.2d 42, 47 (2d Cir. 1990); *McGill v. Michigan Steamship Co.*, 144 F. 788, 795-96 (9th Cir. 1906) (errors in navigation may be so extreme as to raise a presumption of the crew's incompetence). "[I]n such cases where navigational negligence is so extreme as to raise a presumption of incompetence of the crew, the shipowner or carrier may rebut the presumption by demonstrating that it exercised due diligence in selecting or training a competent crew." *Potomac Transport*, 909 F.2d at 47 (2d Cir. 1990).

Whether a court deems a crew negligent or incompetent depends on the facts and circumstances of each case. *See Tropical Marine Products*, 247 F.2d at 121-22 (holding that the master's attempt to sail to a port of haven when the boat took on water was mere negligence); *Lemar Towing, Co., Inc. v. Fireman's Fund Insurance Co.*, 352 F. Supp. 652, 661 (E.D. La. 1972) (holding that a captain's inability to make a simple inland water voyage which resulted in the vessel sinking rendered him incompetent). The Eastern District of Louisiana noted that "[w]hile a single series of events indicating gross negligence or mismanagement of the vessel may not be conclusive criteria determining the competency of the crew, certain instances can be revealing with regard to this issue." *Id.* at 159.

**D.  Analysis**

The Southern District of Texas addressed a situation very similar to the present case in *Gulf Coast Trawlers, Inc. v. Resolute Ins. Co.*, 239 F. Supp. 424 (S.D. Tex. 1965), and held that the actions of the crew constituted negligence, not incompetence. There, a vessel's two-man crew slept aboard for six hours and awoke "to find water at the stern deck and the engine room flooded." *Id.* at 426. Though the vessel had been in good working order prior to this incident, it sank and was a total loss. *Id.* The insurance company asserted that only carrying a two-man crew rendered the vessel unseaworthy, and urged "that if the O/S JOYCE MARIE had had three crewmen on board, the chances of one of them standing watch would have been greater and that the leaking could have

been discovered, the pumps put to work, and the vessel brought into port and saved." *Id.* The O/S JOYCE MARIE, unlike the LAURA T, was tied to another vessel at anchor, and not sailing on auto-pilot. The court held, "If we are to assume that an anchor watch is necessary when boats are tied up . . . the failure to have watch is negligence of the master, and that is no consolation to the insurers in this case." *Id.* at 426-27.

The present case is distinguishable from *Gulf Coast Trawlers* in an important respect: while the O/S JOYCE MARIE was safely tied at anchor when the crew slept, the LAURA T was underway on auto-pilot with no watch. Falling asleep while alone, on auto-pilot, with no watch rises above mere negligence and demonstrates more than a lack of due diligence. His actions endangered himself and others. When a boat is not tied at anchor, having a look out while the crew sleeps would be a necessary precaution. Although Catlin's testimony indicates that it was not his intention to fall asleep, he could have taken precautions to avoid an accident, such as setting an alarm clock or ensuring that the high water alarm was not set on mute. *Cf. Thanh Long Partnership v. Highlands Ins. Co.*, 32 F.2d 189, 194 (5th Cir. 1994) ("We hold that Quang Tran, as owner, knowingly permitted the BIG TOM to proceed without an operable high water bilge alarm, rendering the vessel unseaworthy and demonstrating a lack of due diligence which removed the casualty from coverage under the Inchmaree clause.")

Because the vessel sank in calm waters, there is a presumption that the LAURA T was unseaworthy. *See P.T. TUGS, Inc.*, 796 F.2d at 127. Catlin must rebut this

9

presumption by demonstrating that he acted with due diligence to ensure that the LAURA T was manned by a competent crew, and that he took precautions to assure his competence while aboard. *See Lemar Towing*, 352 F. Supp. at 660. Based on the evidence presented at trial, this Court finds that Mr. Catlin has not adequately established that he acted with due diligence to serve as a competent crew while aboard the LAURA T. *See Lemar Towing*, 352 F. Supp. at 660. The Court agrees with Mr. Lizny's testimony which characterizes the vessel's unseaworthiness as a "chain of events." On his first solo off shore voyage, Mr. Catlin fell asleep while the vessel was on auto-pilot, with no one at watch, with the high water alarm turned on mute, and the bilge pumps failed. Thus, Mr. Catlin has not met his burden to rebut the presumption that the vessel was unseaworthy. *P.T. TUGS, Inc.*, 796 F.2d at 127.

## IV.  CONCLUSION

It is the finding of this Court that Mr. Catlin's behavior on the LAURA T rendered him an incompetent crew. Because Mr. Catlin's incompetence rendered the vessel unseawrothy, the loss of the LAURA T is not covered by the insurance policy. Therefore, St. Paul's Fire & Marine Insurance Company is not liable. This Court enters judgment in favor of the defendant. Plaintiff shall recover nothing.

ORDERED this 29th day of July, 2005.

_____
HAYDEN HEAD
CHIEF JUDGE